IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| for the use of AIM STEEL, INC., | ) | |
| and AIM STEEL, INC., individually and | ) | |
| for itself | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | CASE NO. |
| v. | ) | |
| | ) | _____ |
| TETRA TECH, INC., | ) | |
| TTEC-TESORO JOINT VENTURE, | ) | |
| TETRA TECH TESORO, INC., | ) | **JURY TRIAL DEMANDED** |
| TETRA TECH EC, INC., TETRA TECH | ) | |
| FACILITIES CONSTRUCTION, LLC, and | ) | |
| SAFECO INSURANCE COMPANY OF | ) | |
| AMERICA, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiffs the United States of America for the use of AIM Steel, Inc. and AIM Steel, Inc.,
individually and for itself ("Plaintiff or "AIM"), file this Original Complaint for damages against
Defendants Ttec-Tesoro Joint Venture, Tetra Tech, Inc., Tetra Tech Tesoro, Inc., Tetra Tech EC,
Inc., Tetra Tech Facilities Construction, LLC and Safeco Insurance Company of America
("Safeco" or "Surety"), alleging as follows:

### Nature and Statutory Basis of Action

1.

Plaintiff brings this action under the Miller Act, 40 U.S.C. § 3131, *et seq.*  Further, this
action is based on Georgia state law claims of breach of contract and tort, which claims are so
related to Plaintiff's Miller Act claims that they form part of the same case or controversy.

2.

Plaintiff AIM Steel, Inc. is a Georgia corporation, in good standing, with its principal place of business located at 1078 Citizens Parkway, Suite 1, Morrow, Georgia 30260.

3.

Upon Information and belief, Defendant Tetra Tech, Inc. is a Delaware corporation, which has transacted business as a partner in a joint venture under the name "Ttec-Tesoro Joint Venture" or "Ttec-Tesoro JV" in Richmond County, Georgia, as the design-build prime contractor to the United States Army Corps. of Engineers ("USACE") on a federal public works project more particularly described below, and Defendant Tetra Tech, Inc. is therefore subject to the personal jurisdiction of this Court.

4.

Defendant Tetra Tech, Inc. is authorized to do business in Georgia, and may be served with process, with issuance of citation being requested at this time, by serving its Registered Agent, CT Corporation Services, at 1201 Peachtree Street, Atlanta, Georgia 30361.

5.

Upon information and belief, Defendant Tetra Tech Tesoro, Inc. is a Virginia corporation, which has transacted business as a partner in a Joint Venture under the name "Ttec-Tesoro Joint Venture" or "Ttec-Tesoro JV" in Richmond County, Georgia, as the design-build prime contractor to the USACE on a federal public works project more particularly described below, and Defendant Tetra Tech Tesoro, Inc. is therefore subject to the personal jurisdiction of this Court.

6.

Defendant Tetra Tech Tesoro, Inc. may be served with process, with issuance of citation being requested at this time, by serving its Registered Agent CT Corporation System, at 4701 Cox Rd, Ste 301, Glen Allen, VA 23060.

7.

Defendant Tetra Tech EC, Inc. is a Delaware corporation, which has transacted business as a partner in a Joint Venture under the name "Ttec-Tesoro Joint Venture" or "Ttec-Tesoro JV" in Richmond County, Georgia, as the general contractor for a federal public works project, and Defendant Tetra Tech EC, Inc. is therefore subject to the personal jurisdiction of this Court.

8.

Defendant Tetra Tech EC, Inc. is authorized to do business in Georgia, and may be served with process, with issuance of citation being requested at this time, by serving its Registered Agent, CT Corporation Services, at 1201 Peachtree Street, Atlanta, Georgia 30361.

9.

Upon information and belief, Defendant Tetra Tech Facilities Construction, LLC, (a/k/a Tetra Tech FC, LLC) is a Delaware Limited Liability Company, which has transacted business as a partner in a Joint Venture under the name "Ttec-Tesoro Joint Venture" or "Ttec-Tesoro JV" in Richmond County, Georgia, as the design-build prime contractor on a federal public works project more particularly described below, and Defendant Tetra Tech Facilities Construction, LLC is therefore subject to the personal jurisdiction of this Court.

10.

Defendant Tetra Tech Facilities Construction, LLC is authorized to do business in Georgia, and may be served with process, with issuance of citation being requested at this time,

by serving its Registered Agent, CT Corporation Services, at 1201 Peachtree Street, Atlanta, Georgia 30361.

11.

Defendant Ttec-Tesoro Joint Venture is a joint venture comprised of partners Tetra Tech, Inc., Tetra Tech Tesoro, Inc., Tetra Tech EC, Inc., and Tetra Tech Facilities Construction, LLC. Defendant Ttec-Tesoro Joint Venture has transacted business in Richmond County, Georgia, as the design-build prime contractor to the USACE on a federal public works project more particularly described below, and Defendant Ttec-Tesoro Joint Venture is therefore subject to the personal jurisdiction of this Court.

12.

Upon information and belief, Defendant Ttec-Tesoro Joint Venture may be served with process at its office at 302 Research Drive, Suite 200, Norcross, Gwinnett County, Georgia 30092, or otherwise through partner Defendant Tetra Tech EC, Inc. by service upon its Registered Agent, CT Corporation, at 1201 Peachtree Street, Atlanta, Georgia 30361.

13.

Defendant Safeco Insurance Company of America (hereinafter "Safeco" or "Surety") is a Washington insurance company authorized to do business in Georgia and can be served upon its registered agent, Corporation Service Company, at 40 Technology Parkway South #300, Norcross, Georgia 30092.

14.

With respect to the contractual counts herein, Defendants Tetra Tech, Inc., Tetra Tech Tesoro, Inc., Tetra Tech Facilities Construction, LLC, Tetra Tech EC, Inc., and Ttec-Tesoro Joint Venture, upon information and belief, are joint obligors and therefore are jointly and

severally liable to AIM for any debts and/or obligations owed to AIM by Ttec-Tesoro Joint Venture. Defendants Tetra Tech EC, Inc. is identified as the "Buyer" on a subcontract entered into between AIM (the entity defined as "Seller") and Defendant Ttec-Tesoro Joint Venture in connection with a federal public works project more particularly described below and giving rise to this action.   However, the "Bill *To"* entity on this subcontract is "Tetra Tech Facilities Construction."   Ttec-Tesoro Joint Venture is the entity identified as the prime design-build contractor to the United States Corps. Of Engineers ("USACE") on a federal public works project more particularly described below.

15.

Upon information and belief, Defendants Tetra Tech, Inc., Tetra Tech Tesoro, Inc., Tetra Tech EC, Inc. and Tetra Tech Facilities Construction, LLC, are partners in the Ttec-Tesoro Joint Venture, and thus are jointly and severally liable for the debts of Ttec-Tesoro Joint Venture. Defendants Tetra Tech, Inc., Tetra Tech Tesoro, Inc., Tetra Tech EC, Inc., Tetra Tech Facilities Construction, LLC, and Ttec-Tesoro Joint Venture are collectively referred to herein as the "Tetra Tech Defendants."

16.

Ttec-Tesoro Joint Venture is the principal and Safeco is the surety on a payment bond issued pursuant to the Miller Act, whereby the Defendants have bound themselves, jointly and severally, to the United States of America for a penal sum in excess of AIM's claims, said bond being conditioned upon prompt payment by Ttec-Tesoro Joint Venture, Tetra Tech, Inc., Tetra Tech EC, Inc., Tetra Tech Facilities Construction, LLC, Tetra Tech Tesoro, Inc. and/or Safeco to all subcontractors for furnishing of labor and/or materials used in the on the public works project giving rise to this action and as more particularly described below.

17.

With respect to the torts described herein, Tetra Tech EC Inc., Tetra Tech Facilities Construction, LLC, Tetra Tech, Inc., and Ttec-Tesoro Joint Venture are joint tortfeasors and are therefore jointly and severally liable to AIM.

**Jurisdiction and Venue**

18.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the provisions of the Miller Act, 40 U.S.C. § 1331(b)(3)(B).  The Court has supplemental jurisdiction over the state law tort and breach of contract claims pursuant to 28 U.S.C. § 1367.

19.

The Defendants are corporations doing business presently or in the past, in the State of Georgia, thus subjecting them to the personal jurisdiction of this Court.

20.

The subcontract at issue was to be performed in Richmond County, Georgia.

21.

Venue is therefore proper in this district under 40 U.S.C. § 3133(b)(3)(B).

**General Background**

22.

On or about September 7, 2007, the USACE awarded Ttec-Tesoro Joint Venture ("TTJV") Prime Contract No. W912HN-07-D0058 ("the Prime Contract") pursuant to which TTJV agreed to provide design services and to furnish labor, materials, tools, equipment and construction services in connection with the renovation and enlargement of certain facilities and structures at Fort Gordon, Georgia (the "Project").

23.

More specifically, TTJV's original scope of work on the Project was for the design and build of Battalion Headquarters Building 29602 ("Battalion Building"), Brigade Headquarters Building 25710 ("Brigade Building), Dining Facility Building 26704 ("Dining Facility"), and Barracks Building 29715 ("Barracks Building 715")(collectively referred to herein as the "Facilities"). Pursuant to the Prime Contract, TTJV was to completely renovate the Facilities and enlarge the Dining Facility.

24.

The objective of the Prime Contract was to design and construct the facilities for the collapse renovation work that also included mechanical, plumbing, electrical communications systems, and reinforcement of the structural systems of the Facilities to resist progressive collapse.

25.

Upon information and belief, TTJV was responsible for preparing the 100% Final for Construction design documents for the renovations and enlargements of these Facilities.

26.

In connection with TTJV's work on the Project, TTJV and its surety Safeco Insurance Company of America ("Surety") executed and delivered a payment bond which purports to be a bond complying with the provisions of the Federal Miller Act (40 U.S.C. §§ 3131, *et seq.*) (the "Payment Bond"). A true and accurate copy of the Payment Bond is attached hereto as **Exhibit A.**

27.

In furtherance of its work on the Project, TTJV awarded Subcontract Order Number 1028851 to AIM on or about January 28, 2008 (the "Subcontract"). Pursuant to the Subcontract, AIM agreed to furnish labor, materials, tools, equipment and construction services in connection with the fabrication and installation of the structural and miscellaneous steel, metal components, the progressive collapse system and other associated elements that were part of TTJV's design-build work under the Prime Contract.

28.

After the Subcontract award, AIM began work on shop drawings for the steel components of the Project, which were submitted to TTJV for approval. As shop drawings were approved by TTJV, AIM began fabricating the various steel components for the project.

29.

Pursuant to the Project schedule provided by TTJV, AIM's work was to proceed in the following sequence: (1) commencement and completion of AIM's Subcontract work in the Dining Facility, (2) commencement and completion of AIM's Subcontract work in the Brigade Building, (3) commencement and completion of AIM's Subcontract work in the Battalion Building, and (4) commencement and completion of AIM's Subcontract work in the Barrack Building 715.

30.

AIM's original scope of work was scheduled to be completed on April 1, 2009.

**Major Additions to AIM's Scope of Work Without a Subcontract Modification**

31.

On or around the beginning of May 2008, TTJV expanded the original scope of AIM's Subcontract work through the addition of two additional barracks buildings: Barrack Building 29707 ("Barrack Building 707") and Barrack Building 29720 ("Barrack Building 720"). Pursuant to direction from TTJV, the scope of the additional work was to be consistent with the work on Barrack Building 715.

32.

On or around May 21, 2008, AIM submitted to TTJV a cost proposal for the expanded additional work. Pursuant to the cost proposal, AIM contemplated completion of its work on Barrack Building 715 before beginning work on Barrack Building 707 and Barrack Building 720. Also pursuant to AIM's proposal, AIM was to begin and complete its work on Barrack Building 707 before beginning work on Barrack Building 720.

33.

Although the Subcontract requires all modifications and additions to AIM's Subcontract work to be documented as a written change order before work may proceed, TTJV refused to issue AIM a change order.  Instead, TTJV directed AIM to proceed with the development of shop drawings and fabrications of metal components for Barrack Buildings 707 and 720 despite the lack of a written change order.

## Stop Work Order To Deal With Changes to the Design

34.

On or around July 25, 2008 – before AIM had begun work at the Project site but in the midst of AIM's work on its shop drawings and steel fabrication offsite for the original and added scopes of Subcontract work – the USACE issued a Stop Work Order on the Project with respect to certain work within Barracks 715, 707, and 720 in order to address design errors and differing site conditions.   Specifically, it was discovered that the design had to be changed to accommodate bigger footers installed at a greater depth due to soil conditions that were different from what TTJV had anticipated.

35.

Notwithstanding the fact that changes were being made to the Barrack design by USACE and TTJV, AIM was instructed by TTJV to continue its work on the shop drawings and fabrication of steel components for the Facilities.

36.

Given the changes that were expected to the design of Barrack Buildings 707 and 720 and the fact that TTJV refused to issue a written change order to the Subcontract for the significant increase in cost arising from the addition of two more Barrack Buildings, AIM notified TTJV that it could not continue with shop drawing and offsite fabrication work until the design issues were resolved and a change order was issued. In response, TTJV directed AIM to proceed or risk termination of its Subcontract. Thus, AIM proceeded as directed.

37.

Between July 2008 and October 2008, AIM continued its work on the shop drawings and offsite fabrication of steel components for the Dining Facility, the Battalion Building, the Brigade Building and Barrack Building 715 as directed by TTJV.

38.

On or about October 5, 2008, AIM commenced work on the Project site pursuant to direction from TTJV.

39.

On or around November 7, 2008, AIM timely completed its work on the Dining Facility, Brigade Building, and Battalion Building.

**Changes in the Design Result in Changes to Logical Sequence of Work**

40.

Following completion of the Subcontract work on the Dining Facility, Brigade Building and Battalion Building on November 7, 2008, AIM was unable to move its work crews and equipment to Barrack 715, the next building in its sequence of work, due to the Stop Work Order. Between November 8, 2008 and November 18, 2008 – the date when the Stop Work Order was finally lifted – AIM's work crews and equipment remained idle.

41.

When the Stop Work Order was finally lifted on November 18, 2008 and AIM's crews arrived on site to perform its work in Barrack 715, they discovered that other trades subcontracted to TTJV had been permitted to come into Barrack Building 715 and perform their work despite the fact that the Project schedule clearly provided for the completion of AIM's

structural steel and partial collapse system installation *before* the start of work by these other trades. For instance, the Project sequencing schedule provided that AIM's installation work relative to the steel straps and steel columns and beams was to *precede* the mechanical, electrical and plumbing ("MEP") work as well as the metal stud work that was not within AIM's scope of work. However, when AIM appeared on site to begin its work in Barrack Building 715 on November 18, 2008, the MEP work was well underway and the metal studs had already been installed.

42.

Because TTJV had failed to notify AIM of this change to the logical sequence of planned work for the Project, AIM had to immediately begin to reconsider its own sequencing, means and methods in Barrack Building 715. In addition, AIM provided timely notice to TTJV about how TTJV's changes to the logical sequence of the Project schedule were anticipated to impact and disrupt AIM's planned work, resulting in extra costs and impacts to the schedule.

43.

Certain aspects of AIM's work absolutely could not be re-sequenced due to the nature of this work. For instance, the progressive collapse system by design must be installed in a very specific sequence. AIM discovered it could not install the progressive collapse system in sequence without interfering with completed MEP work or without the removal of metal studs prematurely installed.  In order to install the progressive collapse system in sequence, AIM was required to weave and maneuver the system's steel beams around the existing MEP work and metal studs. In so doing, it cost AIM three times the estimated price to perform this work.

44.

As required by the Subcontract under these circumstances, AIM issued written notice to TTJV that the changed sequencing of the Project work was expected to impact the performance of AIM's work, increasing its costs and impacting the schedule. These increased costs and schedule impacts were expected to arise from unanticipated work-arounds, performance of out-of-sequence work, equipment and manpower sitting idle while TTJV's design team responded to AIM's Requests for Information ("RFIs"), and interruptions to AIM's work by other trades completing their subcontract and punchlist work. Accordingly, AIM again requested TTJV issue a change order for the additional work and to also include an allowance for these impacts to AIM's Subcontract price and schedule. This request was ignored.

45.

Instead of issuing the requested change order, TTJV gave assurances to AIM that it would receive equitable adjustments to its Subcontract price and schedule some time later, and TTJV expressly requested that AIM submit regular notices of its increased costs and schedule impacts due to TTJV's design and schedule sequence logic.

46.

Relying upon TTJV's assurances that AIM would receive an equitable adjustment in the delivery schedule and the price through change orders, AIM proceeded with its work and provided TTJV with the requested periodic updates on increased costs arising from impacted work.

47.

On or about January 29, 2009, TTJV issued Modification Number 3 to AIM's Subcontract for the same price quoted in AIM's May 21, 2008 proposal, despite the fact that the

work had not proceeded in the manner in which AIM planned when it submitted its May 21, 2008 proposal but had instead been significantly impacted by TTJV's design changes and re-sequencing of the Project work. AIM objected to this modification on the basis that TTJV had not considered AIM's increased costs and impacts to the delivery of its work, as regularly noticed by AIM pursuant to TTJV's request back in November 2008.

48.

Although AIM was scheduled to complete its work in Barrack Building 715 before moving on to perform its work in Barrack Building 707, TTJV directed AIM to begin work on Barrack Building 707 before Barrack Building 715 was completed in order to move the schedule forward. To accommodate TTJV's scheduling directions, AIM was forced to accelerate its work by performing on both Barracks at the same time. AIM began its on-site work on Barrack Building 707 on or around March 9, 2009.

49.

Upon arrival on site of Barrack Building 707, AIM instantly realized that TTJV had created the same impact situation for AIM as experienced in Barrack Building 715 by allowing the installation of the MEP work and metal studs before AIM could erect its structural steel and progressive collapse system.

50.

Again, AIM provided written notification of the anticipated impacts to its work due to TTJV's interference with and disruptions to AIM's work by directing other trades to perform their work out of sequence, without providing any prior notification to AIM or otherwise seeking AIM's input on how to mitigate or minimize the same types of impacts that occurred, and were then still occurring, in Barrack Building 715 relative to AIM's steel work.

51.

TTJV then directed AIM to begin work on Barrack Building 720, despite the fact that AIM's work in neither Barrack Building 715 nor Barrack Building 707 had been completed as contemplated by the Project schedule.  To accommodate TTJV's direction, AIM was forced to accelerate its work by performing on both Barracks at the same time. AIM began its on-site work on Barrack Building 720 on or around May 19, 2009.

52.

After AIM began its work in Barrack Building 720, TTJV decided to change the design to Barrack Building 720 such that the steel straps originally to be installed from the exterior would now be installed from the interior of the Building. This resulted in TTJV partially suspending AIM's work in Barrack Building 720 until the design changes could be made. Although the design was undergoing changes, TTJV nonetheless directed AIM to proceed with shop drawings and fabrication of certain steel components. AIM refused on the basis that it could not commence any structural steel or collapse system work in Barrack Building 720 until the design issues were resolved and a change order was issued reflecting the modifications to the design. Despite these clear interruptions, TTJV demanded AIM continue work without a change order, in clear contravention of the Subcontract.

53.

Although AIM attempted to accommodate TTJV's revised schedule logic through acceleration and performance of out-of-sequence work, TTJV's interferences with AIM's work-arounds created unreasonable impacts to AIM's delivery schedule and increased AIM's costs. Throughout the Project, AIM mobilized work crews on site based on TTJV's representations that the work of other trades scheduled to precede AIM's work had been completed and the site was

ready for AIM's equipment and work crews. However, on multiple occasions upon arriving on the Project site, AIM's work crews were turned away and told to leave because the scheduled work of the other trades had not, in fact, been sufficiently completed to allow AIM to proceed with its scope of work in the same area. For instance, TTJV represented to AIM that all asbestos and lead would be removed before AIM's work was scheduled to commence since AIM could not begin its work until the asbestos and lead were removed. TTJV then advised AIM that all the asbestos and lead had been removed and the area was ready for AIM's workers and equipment. Upon arriving on site, however, AIM discovered that the asbestos and lead had not, in fact, been removed. AIM incurred increased costs and schedule impacts associated with this mobilization and demobilization effort.

54.

Similarly, TTJV failed to complete the demolition work and ventilation work in certain work areas, which was necessary before AIM could begin its work in those same areas. Nonetheless, TTJV forced AIM to mobilize when building work areas were not prepared but would then threaten to find another steel erector if AIM refused to mobilize.

**<u>Active and Willful Interferences with AIM's Work</u>**

55.

TTJV continued to actively and directly interfere with and cause hindrances to the performance of AIM's work on the Project throughout 2009 and 2010 through willful disruptions, unreasonable orders to accelerate, unreasonable orders to perform work out of sequence, and unreasonable orders to correct allegedly deficient or incomplete work that was either not within AIM's scope or could not be completed without additional information from TTJV.

56.

On Barrack Building 720, TTJV, with the intent to hinder and interfere with AIM's delivery schedule, installed roof trusses before AIM had finished erecting the structural steel, despite the fact that AIM informed TTJV prior to the installation of the roof trusses that such an act would result in significant interference of AIM's work.

57.

On Barrack Buildings 707 and 720, TTJV intentionally provided AIM with incorrect benchmark measurements relative to setting the elevation of structural steel. This willful act of bad faith unreasonably interfered with AIM's ability to deliver Barrack Buildings 707 and 720 according to schedule.

58.

TTJV committed additional acts of willful and active interference of AIM's work in Barrack Building 720 by forcing AIM to mobilize and demobilize multiple times when responding to TTJV's orders to perform work in areas that were not ready for AIM's work. For instance, on six different occasions, AIM mobilized and demobilized its work force and equipment in connection with its attempt to perform work in the crawl space of Barrack Building 720 at the direction of TTJV. In each instance of the six instances AIM mobilized to perform its work, AIM discovered that TTJV had not yet backfilled the site in preparation for AIM's work, which could not proceed before the soil had been backfilled by TTJV.

59.

In addition to TTJV's changes to design, changes to schedule logic and its directions to accelerate and perform its work out-of-sequence, TTJV caused AIM to suffer cost and schedule delivery impacts due to TTJV's refusal to timely respond to Requests for Information ("RFIs")

on how AIM was to proceed given the impediments posed by the MEP rough-in work and metal stud installation. In some instances TTJV was forced to tear out some of the MEP and metal-stud work so that AIM's work could proceed. Requesting TTJV to remove these impediments, waiting for a response, and waiting for the actual removal work by TTJV would often take days, weeks, and in some instances, months.

60.

On numerous occasions, TTJV did not pass along AIM's requests for change orders and RFIs to the Project inspectors and/or Quality Control officials.  These interferences ultimately led to discrepancy reports being filed against AIM, despite the fact that AIM could not complete its work without the approved change orders and responses to its RFIs. AIM notified TTJV management about this problem, but TTJV failed to correct it, which caused further unreasonable and willful interference to AIM's work.

61.

TTJV did not properly and promptly answer many of the RFI's submitted by AIM.  At certain meetings regarding the Project, TTJV expressly told AIM not to submit requests for change orders or RFI's, as TTJV would submit them itself.  However, TTJV did not submit these items after promising to do so. In fact, TTJV management notified AIM in January 2010 that it would no longer even bother answering AIM's RFIs.

62.

Additionally, TTJV often took months to approve requests for change orders. Pursuant to the Subcontract, AIM could not proceed with changed work without a written change order to the Subcontract.  TTJV's refusal to issue change orders when modifying and expanding AIM's work not only caused major interruptions to AIM's scheduled work, but it also caused conflicts

18

with the inspectors and quality control officials who incorrectly believed that AIM was not timely performing its work in accordance with the Subcontract documents.

63.

AIM suffered additional impacts due to TTJV's refusal to return approved shop drawings in a timely fashion pursuant to the Project schedule. Because AIM could not perform a particular scope of work until its shop drawings were approved, TTJV's refusal to timely approve AIM's shop drawings interfered with AIM's delivery schedule.

**TTJV's Failure to Make Timely Payment to AIM**

64.

On or about June 20, 2010, AIM submitted to TTJV, in accordance with the Subcontract, its Payment Application #19 certifying that AIM was owed $30,057.00 for work performed through that date.

65.

On or about June 30, 2010, AIM submitted to TTJV, in accordance with the Subcontract, its Payment Application #20 certifying that AIM was owed $218,525.44 for work performed through that date.

66.

As reflected in Payment Application #20, $35,243.54 worth of Subcontract work had yet to be performed by AIM on its Subcontract. The majority of this $35,243.54 balance was intended to cover the installation of the balcony rails in Barrack Building 720, work that AIM could not perform until the 3rd floor balcony concrete was poured and work that TTJV ultimately refused to let AIM perform.

67.

The amounts requested through Payment Application Nos. 19 and 20 are for amounts that were withheld by TTJV over the course of the Project.  More specifically, TTJV withheld from each progress payment made to AIM 5% of the amount owed to AIM until completion of its "close-out" duties and an additional 5% of the amount owed to AIM until completion of its "punchlist" work.

68.

Despite the fact that the Subcontract does not permit TTJV to withhold retainage on the progress payments owed to AIM for the sole purpose of ensuring completion of close-out and punchlist work, TTJV nonetheless withheld 10% of the each progress payment to AIM over the course of the Project.

69.

Upon information and belief, TTJV was paid by the USACE each pay period for the total, 100% amount billed by AIM through Payment Applications Nos. 1 through 20.  Upon information and belief, no amounts were regularly withheld by USACE from TTJV for amounts TTJV regularly withheld from AIM.

70.

Upon information and belief, TTJV routinely and wrongfully withheld 10% of the funds paid by the USACE to TTJV for work performed by AIM, despite TTJV's contractual obligation to pass through the full amount received from the USACE for AIM's work within seven (7) days of TTJV receiving payment from the USACE.

71.

In accordance with contract clause 52.232-27 set forth in the Federal Acquisition Regulations at 48 C.F.R. Section 52, which is incorporated by reference into the Subcontract in Section III, Exhibit III.A – Prime Contract Flow Down Clauses, AIM is entitled to recover interest on amounts paid to TTJV by USACE for work performed by AIM but not paid to AIM within seven (7) days of TTJV's receipt of payment from USACE at the rate computed in accordance with contract clause 52.232-27.

72.

In total, TTJV wrongfully withheld from AIM payment of its Subcontract Balance in the amount of $282,826.38 and has failed and refused to pay AIM this Subcontract Balance as it became due, despite AIM's repeated requests for this payment.

## Wrongful Termination and Unjustifiable Backcharges

73.

AIM continued working on the Project through July 30, 2010, at which time no further work could be completed due to TTJV's incomplete or total lack of response to AIM's RFIs, request for change orders, and/or other hindrances and obstructions to the completion of the AIM's work caused by TTJV and/or its other subcontractors.  AIM estimates that by July 30, 2010, it had completed approximately 95% of the scope of its work.

74.

On or around September 21, 2010, TTJV referred to a "Deficiency List" by letter to AIM that purportedly identified items of work within AIM's scope that had allegedly been left incomplete and/or deficient. Pursuant to this September 21, 2010 letter, TTJV demanded that

AIM cure these alleged items of incomplete or nonconforming work or risk being declared in default of the Subcontract.

75.

On or around September 22, 2010, AIM responded to TTJV's September 21, 2010 letter explaining that it had not received any recently issued "Deficiency List," and that the last discrepancy report concerning alleged discrepancies with AIM's work was received in early June 2010. AIM additionally asked for a copy of any recent "Deficiency List" and proceeded to explain why certain items on the June 2010 discrepancy list were not the responsibility of AIM, while explaining that other items identified therein required additional documentation, information or explanation in order for AIM to complete and/or remedy them. Pursuant to the disputes resolution clause in the Subcontract, AIM requested a meeting with TTJV to go over each item on the recent "Deficiency List" referred to in TTJV's September 21, 2010 letter.

76.

TTJV ignored AIM's request for a meeting.

77.

On or around Friday October 8, 2010, AIM received a letter dated October 7, 2010 from TTJV ordering AIM to cure the alleged deficiencies identified in TTJV's September 21, 2010 "Deficiency List" within three (3) days. Should AIM fail to cure within the three (3) day period, TTJV threatened to default AIM and terminate its Subcontract. *See* TTJV letter dated October 7, 2010 Letter attached hereto as **Exhibit B.**

78.

On the same day AIM received TTJV's October 7, 2010 letter, Friday October 8, 2010, AIM indicated its willingness to come to the Project site the following week to resolve any

22

outstanding issues within AIM's scope of work that could be performed, provided the site has been prepared for such work. *See* AIM Letter dated October 8, 2010 attached hereto as **Exhibit C.**

79.

On or about Tuesday, October 12, 2010, AIM met with TTJV to discuss items of work purportedly within AIM's scope of work that TTJV alleged remained incomplete or nonconforming. At that meeting, AIM pointed out to TTJV that certain items of work could not possibly be performed because TTJV had not yet prepared that area of the site to receive the AIM work. For instance, AIM had not yet installed the 3rd floor balcony rails on Barrack Building 720 because the 3rd floor balcony concrete had not yet been poured by TTJV. For other items, AIM requested additional information that TTJV never provided. *See* AIM Letter to TTJV dated October 27, 2010; *see generally* AIM Letters to TTJV dated September 22, 2010 and October 8, 2010, attached hereto collectively as **Exhibit C.**

80.

Following the October 12, 2010 meeting, AIM mobilized a crew to perform what little work it could with the information provided by TTJV during the October 12, 2010 meeting. On the morning of Friday, October 15, 2010, AIM's mobilized work crew arrived onsite to perform said work. However, AIM's workers were turned away and threatened with physical removal from the jobsite.

81.

In a letter dated October 14, 2010 – but not received until after the October 15, 2010 incident on the jobsite where AIM's crews were ordered to leave – TTJV terminated AIM's Subcontract. Pursuant to TTJV's October 14, 2010 letter, the reason for termination was AIM's

23

alleged failure to mobilize on the Project for "weeks," despite the fact that TTJV had previously told AIM not to mobilize as the preceding work was not prepared.

82.

TTJV's determination that AIM was allegedly in default was unfounded, and TTJV's subsequent termination of AIM's Subcontract was wrongful.

83.

Following the wrongful termination of AIM's Subcontract, AIM learned additional information indicating that TTJV not only acted without justifiable basis in defaulting AIM, but also acted in bad faith in terminating the Subcontract and unjustly backcharging AIM for grossly inflated costs, many of which were incurred in the performance of work outside of AIM's scope and/or for which TTJV had already been paid by the USACE.

84.

TTJV has alleged that following termination, it incurred costs of $385,513.00 in connection with purported efforts to complete and/or remediate AIM's work, and TTJV has backcharged this amount from AIM's Subcontract balance through deductive Subcontract Modification Nos. 9 and 10.  However, back on or around January 18, 2010, representatives from AIM and TTJV conversed by phone regarding the cost to complete and/or remediate items identified in deficiency reports regarding AIM's scope of work. Initially, TTJV contended that completion and/or remediation of the items on this list would cost approximately $21,000. However, by the end of the telephone call, the representatives from TTJV and AIM concluded and agreed that the actual cost to complete and/or remediate items of work within AIM's scope amounted to much lesser amount: approximately $3,000.00 As such, AIM consented to TTJV's withholding of approximately $3,000.00 from AIM's Subcontract balance, as reflected in

Payment Application No. 17 submitted on January 13, 2010, until AIM completed and/or remediated the agreed-upon items of work.

85.

Over the course of the months to follow and through October 2010, there were very few additions to the deficiency list documenting items of incomplete and/or nonconforming work within AIM's scope, as established during the January 13, 2010 telephone call. Nonetheless, following the termination of AIM's Subcontract, TTJV issued deductive Subcontract Modification Nos. 9 and 10, backcharging AIM for $385,513.00, an amount 100 times greater than the agreed-upon cost to complete and/remediate items of AIM's work identified in deficiency reports.

86.

Upon information and belief, the USACE paid TTJV *prior to* the termination of AIM's contract a portion of the costs TTJV claims to have incurred *long after* termination of AIM's Subcontract. The remaining costs allegedly incurred by TTJV were attributable to the completion or correction of TTJV's own work and/or the work of its other subcontractors.

87.

There are additional facts suggesting TTJV's motivation for intentionally, recklessly, and negligently interfering with and impacting AIM's work. Upon information and belief, TTJV grossly underbid the Project with the USACE and thereafter exploited its position over AIM to make a profit to the detriment of AIM.

88.

Upon information and belief, TTJV intentionally performed work knowing that it would unreasonably interrupt and obstruct AIM's work in order to make a profit where TTJV otherwise might have lost money.

89.

Upon information and belief, TTJV's design team refused to answer certain RFIs submitted by AIM due to internal financial disputes between the design and builder teams comprising the TTJV design-build team.  These refusals to respond to AIM's RFI's constitute willful and deliberate attempts to interrupt and hinder AIM's work.

90.

Upon information and belief, TTJV's own employees and site personnel caused unreasonable impacts and hindrances to AIM's work through their incompetence and/or failure to manage the Project.

91.

Upon information and belief, TTJV, sent an employee named Frank Crouch to the Project for the sole purpose of creating a case that would support TTJV's removal from the Project.

92.

TTJV's personnel also treated AIM's principle and employees in a markedly hostile manner and in a manner in which a reasonable person would find objectively discriminatory and extremely offensive.

93.

TTJV's hostile conduct is evidenced by its project manager's references to the dangers of "educating niggers," use of the derogatory term "boy" towards Omar Ali, President of AIM, as well as negative references to Mr. Ali's Muslim faith.

94.

TTJV's actions toward AIM on this Project as described in the preceding paragraphs cumulatively constitute bad faith on the part of TTJV on this Project toward AIM.

<u>COUNT I:</u>
<u>BREACH OF CONTRACT AS TO TTJV</u>

95.

AIM incorporates by reference all preceding paragraphs of this Complaint.

96.

The Subcontract constitutes a binding and enforceable contract between AIM and TTJV.

97.

TTJV has materially breached the Subcontract in various respects, including but not limited to:

(a)     Directing AIM to perform changed and additional work without first issuing written change orders;

(b)     Failing and refusing to make timely payment to AIM for portions of the Subcontract balance that were wrongfully withheld during each payment period;

(c)     Failing and refusing to pay interest on these overdue amounts;

(d)     Failing and refusing to provide an equitable adjustment in the delivery schedule and/or Subcontract price in connection with impacts and interferences to AIM's work that were

attributable to changes made to the design by TTJV and/or those for whom TTJV is legally responsible;

(e)     Failing and refusing to provide an equitable adjustment in the delivery schedule and/or Subcontract price in connection with impacts and interferences to AIM's work arising from the unreasonable re-sequencing of AIM's work by TTJV and/or those for whom TTJV is legally responsible;

(f)     Failing and refusing to provide an equitable adjustment in the delivery schedule and/or Subcontract price in connection with impacts and interferences to AIM's work that were attributable to the unreasonable re-sequencing of the work of TTJV's subcontractors by TTJV and/or those for whom TTJV is legally responsible;

(g)     Failing and refusing to competently exercise overall supervision and control over the schedule of AIM's work;

(h)     Failing and refusing to provide an equitable adjustment in the delivery schedule and/or Subcontract price in connection with impacts and interferences to AIM's work that were attributable to TTJV's directions to mobilize manpower and equipment in areas where the preceding work required for AIM's work had not yet been completed by TTJV and/or those for whom TTJV is legally responsible;

(i)     Failing and refusing to direct AIM's work in accordance with the agreed-upon sequences of procedure;

(j)     Failing and refusing to make a good faith effort to negotiate an equitable adjustment in the delivery schedule and/or Subcontract price in connection with the Stop Work Order that resulted in an increase in time and cost relative to AIM's performance of its work;

(k)     Wrongfully declaring AIM to be in default;

(l)     Wrongfully terminating the Subcontract; and

(m)    Breaching such other general duties of care to AIM as may be revealed during discovery.

98.

As a direct and foreseeable result of the various material breaches of the Subcontract by TTJV and/or those for whom TTJV is legally responsible, AIM has incurred damages approximating $1,700,000, plus interest and any additional amounts that may be proved at trial. Also as a result of the various material breaches of the Subcontract by TTJV and/or those for whom TTJV is legally responsible, AIM has been required to retain the undersigned counsel to represent it in this matter and to incur attorneys' fees and other litigation costs and expenses.

99.

AIM has performed all conditions precedent required by the Subcontract and are entitled to recover the full amount of damages incurred as a direct and foreseeable result of the various material breaches of the Subcontract by TTJV and/or those for whom TTJV is legally responsible.

**COUNT II:**
**BREACH OF THE IMPLIED DUTY OF**
**GOOD FAITH AND FAIR DEALING**
**AS TO TTJV**

100.

AIM incorporates by reference all preceding paragraphs of this Complaint.

101.

Implied in the Subcontract is a covenant of good faith and fair dealing between the parties.

102.

TTJV has breached the implied covenant of good faith and fair dealing by directing AIM to perform changed and additional work without first issuing written change orders as required under the Subcontract.

103.

TTJV has breached the implied covenant of good faith and fair dealing by failing and refusing to provide an equitable adjustment in the delivery schedule and/or Subcontract price in connection with impacts and interferences to AIM's work that were attributable to causes outside of AIM's control and not due to AIM's fault or negligence as required under the Subcontract.

104.

TTJV has breached the implied covenant of good faith and fair dealing by failing and refusing to competently exercise overall supervision and control over the schedule of AIM's work once it assumed said control as provided under the Subcontract.

105.

TTJV has breached the implied covenant of good faith and fair dealing by failing and refusing to direct AIM's work in accordance with the agreed-upon sequences of procedure as required under the Subcontract.

106.

TTJV has breached the implied covenant of good faith and fair dealing by failing and refusing to make a good faith effort to negotiate an equitable adjustment in the delivery schedule and/or Subcontract price in connection with the Stop Work Order that resulted in an increase in time and cost relative to AIM's performance of its work.

107.

TTJV has breached the implied covenant of good faith and fair dealing by wrongfully declaring AIM to be in default and then wrongfully terminating the Subcontract.

108.

As a result of TTJV's breach of the implied covenant of good faith and fair dealing, AIM has suffered damages in an amount approximating $1,700,000.00, plus interest and any additional amounts that may be proved at trial.

## COUNT III:
## FRAUDULENT MISREPRESENTATION AS TO TTJV

109.

AIM incorporates by reference all preceding paragraphs of this Complaint.

110.

TTJV made material misrepresentations regarding the scope of the Subcontract work by misrepresenting the soil conditions of the Project, failing to timely notify AIM of design changes, failing to timely notify AIM of unprepared work areas, forcing AIM to work out of sequence with other trades, erecting work that interfered with AIM's work, demanding AIM to accelerate its work and, in general, significantly adding to the scope of the Work while failing to timely sign change orders and pay AIM, if at all.

111.

TTJV represented to AIM on multiple occasions that it would sign change orders and pay AIM for said change orders, even though TTJV later failed and refused to sign said change orders when requested by AIM.

31

112.

TTJV made these misrepresentations with knowledge that they were false or with reckless disregard of the truth, because TTJV knew at the time that the representations were made that it would not sign the change orders to include costs incurred as a result of TTJV's impacts and interferences or sign any change order at all.

113.

TTJV made these misrepresentations with the intention of deceiving AIM.

114.

To induce AIM to complete the changed, additional, and/or modified work without signed changed orders.

115.

AIM relied on and was deceived by TTJV's misrepresentations to its detriment.

116.

AIM reasonably relied on TTJV's misrepresentations that TTJV would issue equitable adjustments to AIM's delivery schedule and/or Subcontract price through the issuance of timely change orders, and AIM acted on those misrepresentations to establish its delivery schedule and Subcontract Price.

117.

AIM has suffered damages as a result of TTJV's misrepresentations, including executing a Subcontract with TTJV for a significantly different scope of work than what TTJV actually directed AIM to perform for reduced compensation.

118.

AIM has provided a greater benefit under the Subcontract to TTJV than what it has been compensated for, and therefore TTJV is jointly and severally liable for the balance owed on AIM's Subcontract, the costs AIM incurred to accommodate TTJV's unreasonable interferences and changes to its work, in addition to its damages to be determined at trial.

## COUNT IV:
## PROMISSORY ESTOPPEL AS TO TTJV

119.

AIM incorporates by reference all preceding paragraphs of this Complaint.

120.

Representatives from TTJV promised to pay AIM for work done pursuant to AIM's requested change orders, even though TTJV later refused to sign the change orders as required by the Subcontract.

121.

AIM justifiably and detrimentally relied on these promises and agreed to complete its respective change order work, despite the fact that TTJV failed and refused to timely sign its change orders.

122.

Injustice can only be avoided by enforcing TTJV's promise and compensating AIM for the costs incurred in performing additional, out-of-scope, out-of-sequence, and impacted work as directed by TTJV in an amount to be determined at trial for which TTJV should be held jointly and severally liable.

## COUNT V:
## QUANTUM MERUIT/UNJUST ENRICHMENT TTJV

123.

AIM incorporates by reference all preceding paragraphs of this Complaint.

124.

AIM provided valuable labor, services, and materials that were necessary for TTJV to complete its obligations under the Prime Contract.

125.

AIM, at the direction of TTJV, provided extra, additional, and supplementary work under burdensome and disruptive conditions caused by TTJV and those for whom TTJV is legally responsible. This caused AIM's work to be significantly more expensive than it should have been – all of which has benefited Tetro Tech.

126.

TTJV benefited from AIM's labor, material and services, as evidenced by the fact that TTJV has made a claim against USACE for a portion of the $1,700,000.00 in costs claimed by AIM against TTJV in connection with the Project.

127.

TTJV has failed and refused to pay AIM for much of its labor, materials and services provided on the Project at the direction and benefit of TTJV.

128.

AIM claims the sum of $1,700,000.00 from TTJV, jointly and severally, on the basis of quantum meruit, implied contract, unjust enrichment or all of them.

## COUNT VI
## CLAIM UNDER MILLER ACT PAYMENT BOND AGAINST THE SURETY AND TTJV

129.

AIM incorporates by reference all preceding paragraphs of this Complaint.

130.

AIM brings this count in the name of the United States of America for the use and benefit of claimant AIM under the Federal Miller Act against TTJV and its Surety on the Payment Bond attached to this Complaint as **Exhibit A**.

131.

AIM is a proper claimant under the terms of the Payment Bond and has expended materials, equipment, tools, labor, and services to improve the Project – a Project that was valued at $17,084,000.00 according to the Payment Bond.

132.

Because AIM was not paid for the materials, equipment, tools, labor, and services it furnished for the Project pursuant to the Subcontract and under the circumstances described herein relating to the Subcontract work, AIM asserted a claim under the Bond by letter dated February 2, 2011, a true and correct copy of which is attached hereto as **Exhibit D** (the "Bond Claim").

133.

As indicated by the Bond Claim, AIM provided notice of its claim under the Bond in accordance with the provisions of the Bond and in accordance with the requirements of the Miller Act, 40 U.S.C. § 3133(b)(2)(A).

134.

Surety and TTJV, as Principal on the Bond, are jointly and severally obligated, pursuant to the Bond, to pay AIM for the materials, equipment, tools, labor, and services it furnished for the Project, and for which TTJV failed to make payment.

135.

Surety and TTJV have refused to honor their outstanding obligations to AIM under the Subcontract, and more than 90 days but less than 365[1] days have elapsed from the day on which AIM performed the last of the labor or furnished or supplied the last of the material for which the Bond Claim was made.  As a result thereof, AIM has been compelled to commence this action. AIM is entitled to recover from TTJV and Safeco under the Bond a sum to be determined at trial for unpaid Work, up to and including $17,084,000.00, as detailed in the Bond.

136.

Alternatively, AIM claims the sum of approximately $1,700,000 as being owed by TtEC-Tesoro JV and the Surety, jointly and severally, under the terms of the Payment Bond, as a non-statutory bond, in the event it is determined that the Payment Bond is not subject to or issued pursuant to the Miller Act.

**COUNT VII:**
**ATTORNEYS FEES AND COSTS**

137.

AIM incorporates by reference the preceding paragraphs of this Complaint.

---

[1] The parties in this action entered into a tolling agreement that tolled the running of the 365-day period from July 1, 2010 through April 1, 2010.

138.

Despite AIM's repeated requests for compensation for extra, additional, and supplementary work, including change order work, performed at the direction of TTJV under burdensome and disruptive conditions caused by TTJV and those for whom TTJV is legally responsible. TTJV has failed and refused to execute change orders to compensate AIM for the extra work and costs associated with said work due to TTJV's unreasonable interruptions and interference to AIM's work.

139.

TTJV has acted in bad faith, has been stubbornly litigious, and has caused AIM unnecessary trouble and expense.

140.

In addition, TTJV has perpetrated fraudulent misrepresentations on AIM.

141.

As a result of this conduct and pursuant to O.C.G.A. §13-6-11, AIM is entitled to recover its attorneys' fees, costs, and all other expenses of litigation.

## COUNT VIII:
## PUNITIVE  DAMAGES

142.

AIM incorporates by reference the preceding paragraphs of this Complaint.

143.

TTJV's acts and misrepresentations constitute willful misconduct, fraud, and wanton disregard for AIM's rights, and accordingly justify the award of exemplary and punitive damages to AIM from TTJV in order to punish TTJV and to deter TTJV from taking such actions against other persons or companies in the future.

37

WHEREFORE, AIM prays for relief as follows:

a.      That it have a jury trial on all issues set forth in this Complaint, which are triable by jury;

b.      That judgment be entered in favor of AIM and against TTJV on Count I for breach of contract, and that AIM be awarded its reasonable costs, profit, and interest arising from TTJV's various material breaches in an amount to be proven at trial;

c.      That judgment be entered in favor of AIM and against TTJV on Count II for breach of the implied duty of good faith and fair dealing, and that AIM be awarded its reasonable costs, profit, and interest arising from TTJV's various material breaches in an amount to be proven at trial;

d.      That judgment be entered in favor of AIM and against TTJV on Count III for fraudulent misrepresentation, and that AIM be awarded damages and punitive damages in an amount to be proven at trial;

e.      That judgment be entered in favor of AIM and against TTJV on Count IV for promissory estoppel and that AIM be awarded its reasonable costs, profit, and interest;

f.      That judgment be entered in favor of AIM and against TTJV on Count V for quantum merit/unjust enrichment and that AIM be awarded damages and the reasonable value of its work in an amount to be proven at trial;

g.      That judgment be entered in favor of AIM and against the Surety and TTJV, jointly and severally, on Count VI for any and all damages which are adjudged to be owed by TTJV to AIM;

h.      That judgment be entered in favor of AIM and against TTJV on Count VII for all attorneys' fees, costs, and other expenses incurred by AIM;

i.      That judgment be entered in favor of AIM and against TTJV on Count VIII for an award of punitive damages as may be determined by the enlightened conscience of a jury;

j.      That judgment be entered in favor of AIM and against the Tetra Tech Defendants, jointly and severally, for any and all liability that TTJV may be adjudged under Counts I, II, III, IV, V, VII, and VIII.

k.      For such other and further relief as this Court deems just and proper.

Respectfully submitted this 24th day of April 2012.

**[SIGNATURE BLOCKS ON FOLLOWING PAGE]**

By: _s/ Christopher A. Cosper_____
Christopher A. Cosper
Georgia Bar No. 142020
ccosper@hullbarrett.com

Of Counsel:
Hull Barrett PC
Post Office Box 1564
Augusta, Georgia 30903-1564
706-722-4481

Michael P. Bain
Georgia Bar No. 141228
(Application for admission *pro hac vice* to be filed)
mbain@mjpatellaw.com

Brian W. Burkhalter
Georgia Bar No. 095809
(Application for admission *pro hac vice* to be filed)
bburkhalter@mjpatellaw.com

Blair Andrews
Georgia Bar No. 018905
bandrews@mjpatellaw.com
(Application for admission *pro hac vice* to be filed)

MJ Patel Law Group
3715 Northside Parkway
Building 400, Suite 230
Atlanta, GA 30327
(678) 974-1503

*Counsel to Plaintiff Aim Steel, Inc.*